**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANNE LARKIN-GALLAGHER,**

                **Plaintiff,**

        **v.**

**CHAMPLAIN VALLEY**
**PHYSICIANS HOSPITAL**
**MEDICAL CENTER,**

                **Defendant.**
_____

                **8:18-cv-1173**
                **(GLS/CFH)**

**APPEARANCES:**              **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Cooper, Erving & Savage, LLP    PHILLIP G. STECK, ESQ.
39 North Pearl Street
4th Floor
Albany, NY 12207

**FOR THE DEFENDANT:**
Nixon, Peabody Law Firm       KIMBERLY KATE HARDING,
1300 Clinton Square             ESQ.
Rochester, NY 14604-1792


**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

    Plaintiff Anne Larkin-Gallagher (hereinafter "Larkin") commenced

this action against defendant Champlain Valley Physicians Hospital

Medical Center (hereinafter "CVPH") pursuant to Title VII of the Civil

Rights Act of 1964[1] and the Family and Medical Leave Act (FMLA).[2]

(Compl., Dkt. No. 1.)  Pending before the court is Larkin's motion for

partial summary judgment as to her Title VII claims, (Dkt. No. 38), Larkin's

motion to remove restrictions on documents, (Dkt. No. 39), and CVPH's

cross-motion for summary judgment, (Dkt. No. 48).  For the reasons that

follow, Larkin's motions for partial summary judgment and to remove

restrictions on documents are denied, and CVPH's cross-motion for

summary judgment is granted.

## II.  Background

### A.    Facts[3]

Larkin began working for CVPH in August 2001, and, during all

relevant times, worked as a phlebotomist in the Fitzpatrick Cancer Center

(FCC) at CVPH's hospital.  (Pl.'s Statement of Material Facts (SMF) ¶ 1,

Dkt. No. 38, Attach. 2.)  As a phlebotomist, Larkin was required to use the

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] *See* 29 U.S.C. §§ 2601-54.

[3] Unless otherwise noted, the facts are undisputed.

following two software programs: Sunquest, a system which manages laboratory tests, and Sorian Financials, a system in which clerical staff in the FCC enter the identity of patients to schedule blood draws in the lab. (*Id.* ¶ 3.)

In June 2016, after complaining to her supervisor, Kathy Bracero, that she was "overloaded with work," Bracero "found days when the number of blood draws [by Larkin] were indeed very high." (*Id.* ¶¶ 1, 11.) A few days later, Larkin detailed her complaints in a union "Patient Care Assignment Despite Objection Form," which was filed with CVPH's human resources department. (*Id.* ¶ 12.) A meeting was then held to discuss Larkin's complaints, which was attended by Larkin, Bracero, Dylan Smith, a union member, and Trudy Miller, an employee in CVPH's human resources department. (*Id.* ¶ 13.) Discussion regarding Larkin's complaints about her workload continued, and Miller informed her superior in human resources, Kevin Manchester, of the same. (*Id.* ¶¶ 18-19.) In late September, Larkin met with Bracero and Manchester "to address conflict that had arisen with clerical staff concerning the scheduling of patients." (*Id.* ¶ 20.)

In July 2016, Larkin learned that she was pregnant. (*Id.* ¶ 14.) She

3

subsequently made multiple requests for time off for doctor's appointments.  (Def.'s SMF ¶¶ 23-24, Dkt. No. 48, Attach. 10.)  Larkin told Bracero of her pregnancy around the beginning of September.  (Pl.'s SMF ¶ 14.)

On December 2, 2016, Camry Church, a CVPH patient, called and spoke to then-CVPH's Compliance Officer Kristen Pope to complain about a potential HIPAA violation.  (*Id.* ¶ 22; Def.'s SMF ¶ 38.)  Church told Pope "that people were talking about her pregnancy at a party, and that she wanted an investigation done to determine who disclosed her confidential information."  (Pl.'s SMF ¶ 22.)  Church "mentioned Larkin as a possible person who could have violated her HIPAA rights, since [Larkin] worked in the hospital," but Larkin "was not the only one she mentioned who could have done it."  (*Id.*)  Pope immediately reported Church's complaint to then-Chief Privacy Officer Star Thornton, who took over the matter. (Def.'s SMF ¶¶ 46-47.)

On December 7, 2016, Miller and Thornton met with Larkin and informed her that she had violated HIPAA, but "did not tell [her] how and provided no information."  (Pl.'s SMF ¶ 28.)  "Todd Estes from the union walked [Larkin] out of the hospital, and she was placed on paid

4

administrative leave." (*Id.*)  Miller and Thornton "promise[d] they would continue to investigate while [Larkin] was out on administrative leave." (*Id.*)

CVPH's disciplinary procedures state that "administrative leave will provide management time to investigate the allegations," and CVPH's discipline policy states that "an intentional violation of the Confidentiality Policy may result in termination.  HIPAA violations will result in immediate termination. . . . The Departmental Director and the Labor & Employee Relations Manager are responsible for accomplishing a thorough investigation prior to disciplining the employee." (*Id.* ¶ 30.)

During the course of the investigation, Thornton ran a preliminary report by running an inquiry in FairWarning, "a notification tool that identifies only potential breaches."  (Def.'s SMF ¶ 51; Pl.'s SMF ¶ 46.) When running this report, Thornton used Larkin's and Church's names to determine who accessed Church's record for the date of service in question.  (Def.'s SMF ¶¶ 51-52.)  "The FairWarning report showed [Larkin] allegedly accessing hundreds of medical records within minutes or seconds of each other, all while the evidence of [Larkin's] work schedule showed her drawing blood from [sixty] patients throughout the day with

5

[ten] minutes allotted for each blood draw." (Pl.'s SMF ¶ 69.) Thornton told Tom Gosrich, the head of human resources at the time, that the report "indicated a significant breach of patient confidentiality." (Def.'s SMF ¶ 69; Pl.'s SMF ¶ 60.)

On December 14, 2016, Larkin met with Miller, Thornton, and Todd Estes, a member of the union, where she "was confronted for the first time with the FairWarning [r]eport purporting to show that she accessed . . . Church's [m]edical [r]ecords and many others repeatedly through Sunquest." (Pl.'s SMF ¶ 34.) In response to the accusations, Larkin requested an investigation, and explained that it was "impossible" for her to have done what she was being accused of; "[t]he software she used did not allow her to do this"; "[s]he had no motive to do this; "[n]or would she even had known what she was looking for." (*Id.* ¶ 40.) Thornton and Miller agreed to continue to investigate, and said, in the meantime, they would be calling all the patients involved to advise them that their HIPAA rights had been violated." (*Id.* ¶¶ 40, 42.)

Later that same day, Larkin "submitted formal FMLA paperwork for pregnancy leave" to CVPH's Occupational Health and Wellness department, "indicating that [her] pregnancy required her to be out of

work." (*Id.* ¶ 43; Def.'s SMF ¶ 72.)  As of that date, Miller was aware of Larkin's pregnancy.  (Pl.'s SMF ¶ 43.)

Thornton discussed the investigation with Miller and Manchester in emails, but Manchester denied involvement in the investigation.  (*Id.* ¶¶ 32-33.)  Thornton also reached out to Helen Fusco in CVPH's Information Security Systems department to inquire into Larkin's audit trails.  (*Id.* ¶ 44; Def.'s SMF ¶ 74.)  Fusco reported that a review of the audit trail found no evidence that Larkin had improperly accessed any medical records, and Thornton similarly testified that "[t]he audit trails did not confirm what FairWarning reported."  (Pl.'s SMF ¶¶ 44-45.)

Thornton conducted no further investigation to support the allegation that Larkin accessed Church's medical records, and "testified she did not know how Larkin could possibly have done that and did not bother to find out [nor did she] know what records of Church had purportedly been accessed."  (*Id.* ¶ 50.)

On December 21, 2016, Thornton prepared a "Breach Notification Assessment Tool," which "purported to confirm the report of FairWarning that [Larkin] had improperly accessed [Church's] patient records," but that "the investigation as to whether there was inappropriate access was

7

ongoing."  (*Id.* ¶ 57.)

On December 28, 2016, Larkin received a termination letter, sent by Miller.  (*Id.* ¶ 59.)  Gosrich, who "was unaware of [the Office of Civil Right's (OCR)] protocols for a HIPAA violation," relied on information from Thornton and Miller "in deciding to terminate Larkin's employment."  (*Id.* ¶¶ 60, 90, 99.)  Gosrich "acknowledged that FairWarning and [Church's complaint] were the sole grounds for Larkin's termination."  (*Id.* ¶ 90.) Bracero was not consulted, nor did she have any input or involvement in the decision to terminate Larkin.  (Def.'s SMF ¶ 86.)  Larkin was ultimately replaced by a non-pregnant employee.  (Pl.'s SMF ¶ 104.)

In January 2017, Larkin attended a grievance meeting with the union, Thornton, and Miller, and complained that CVPH had "advised patients, including . . . Church, that there had been a breach of patient confidentiality."  (*Id.* ¶ 66.)  "The union made a request for the information supporting the adverse finding of improper access against Larkin," (*id.*), which was denied in a memorandum from Miller, wherein she "stat[ed] that Larkin improperly accessed medical records in violation of HIPAA and the hospital's confidentiality policies," (*id.* ¶ 67).

In May 2017, Pope, then-Interim Privacy Officer, having replaced

Thornton, (*id.* ¶ 98), received an inquiry from the OCR regarding a HIPAA compliance investigation, (*id.* ¶ 72).  Pope, who, aside from receiving and reporting Church's complaint to Thornton, had no further involvement with the original investigation, began reviewing the audit results.  (*Id.*; Def.'s SMF ¶ 47.)  Pope concluded that the FairWarning report was inconsistent with audit findings, and hence inaccurate.  (Pl.'s SMF ¶ 72.)  "As it turned out, two workstations, including Larkin's, had been configured to load a patient census on startup which just ran in the background but was not visible to her."  (*Id.*)  "Pope also confirmed that there was no improper access in Soarian," and, "based on information from IT, . . . corroborated [Larkin's] assertion that she never used Sorian Clinicals during the relevant period."  (*Id.* ¶ 73.)  Additionally, Fusco "reconfirm[ed]" that "she found no access by Larkin to any records of . . . Church using the inquiry function in Sunquest," (*id.* ¶ 79), and stated that "further review of Sunquest again confirmed that Larkin had not improperly accessed medical records of anyone," (*id.* ¶ 80).

After reporting her findings to Gosrich and Manchester, Gosrich emailed Pope informing her that "[human resources] would not reconsider."  (*Id.* ¶¶ 75-76.)

In August 2017, Pope sent Church a letter informing her that there had been no improper access to her medical records, and sent "reversal letters to numerous other patients as well."  (*Id.* ¶ 88.)

## B.    Procedural History

Larkin asserts the following claims against CVPH: (1) pregnancy discrimination in violation of Title VII; (2) Title VII retaliation; (3) interference pursuant to FMLA; and (4) retaliation pursuant to FMLA, (Compl. ¶¶ 42-72), and moves for summary judgment as to her Title VII claims, (Dkt. No. 38).  CVPH cross-moves for summary judgment as to all of Larkin's claims.  (Dkt. No. 48.)

## V.  Standard of Review

The standard of review under Fed. R. Civ. P. 56 is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV.  Discussion

## A.    Title VII Pregnancy Discrimination

First, CVPH argues that Larkin cannot make out a *prima facie* case

of pregnancy discrimination because there is no evidence that the decisionmakers involved in her termination knew of her pregnancy before the decision to terminate her was made.  (Dkt. No. 48, Attach. 11 at 8-11.) Second, CVPH contends that Larkin was terminated for legitimate, non-discriminatory reasons—namely, because CVPH believed that Larkin improperly accessed CVPH patients' records in violation of its confidentiality policy—and Larkin cannot establish that the stated reasons for her dismissal are pretext for discrimination.  (*Id.* at 13-24.)  Larkin argues that she has demonstrated that CVPH discriminated against her based on her pregnancy; that "circumstantial evidence shows conclusively that [CVPH] acted with unlawful intent in terminating [her] employment and that the ground given for termination was pretextual"; and that "management knew before Larkin was terminated that Larkin had not improperly accessed medical records of anyone."  (Dkt. No. 38, Attach. 1 at 9-10.)  For the following reasons, the court agrees with CVPH.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In

1978, the Pregnancy Discrimination Act (PDA)[4] was passed, "to enact

Congress's determination that discrimination based on a woman's

pregnancy is, on its face, discrimination because of her sex." *DeMarco v.

CooperVision, Inc.*, 369 F. App'x 254, 255 (2d Cir. 2010) (internal

quotation marks and citation omitted).  The PDA accomplished this by

"amend[ing] Title VII's definition of discrimination 'because of sex' to

include discrimination 'because of or on the basis of pregnancy, childbirth,

or related medical conditions.'"  *Saks v. Franklin Covey Co.*, 316 F.3d 337,

343 (2d Cir. 2003) (quoting 42 U.S.C. § 2000e(k)).  Thus, under the PDA,

an employment practice is unlawful "when pregnancy is 'a motivating

factor' for an adverse employment action."  *Briggs v. Women in Need,

Inc.*, 819 F. Supp. 2d 119, 126 (E.D.N.Y. 2011) (citation omitted).

    Pregnancy discrimination claims, as with any other discrimination

claim, are analyzed under the *McDonnell Douglas* burden-shifting rules,

which place upon the plaintiff the initial burden of making out a *prima facie*

case of discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802 (1973); *DeMarco*, 369 F. App'x at 255; *Quaratino v. Tiffany &

---

    4  *See* 42 U.S.C. § 2000e(k).

*Co.*, 71 F.3d 58, 64 (2d Cir. 1995).  To satisfy her initial burden, the plaintiff must show that: "(1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee," or the discharge occurred under circumstances giving rise to an inference of unlawful discrimination. *Quaratino*, 71 F.3d at 64 (citations omitted).  In addition to the four elements of a *prima facie* case, a "[p]laintiff must also be able to point to some admissible evidence from which a rational jury could infer that [persons who participated in her termination decision] knew that the plaintiff was pregnant."  *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 277-78 (S.D.N.Y. 2008) (citation omitted); *see Ingenito v. Riri USA, Inc.*, No. 11-CV-2569, 2013 WL 752201, at *10 (E.D.N.Y. Feb. 27, 2013) (holding that, to make out a prima facie case of pregnancy discrimination, a "[p]laintiff must establish that the [d]efendants knew or had reason to believe she was pregnant before the decision to terminate her was made" (citation omitted)).

"A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination that shifts the burden of production

to the defendant, who must proffer a legitimate, nondiscriminatory reason

for the challenged employment action."  *Woodman v. WWOR-TV, Inc.*,

411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks and citations

omitted); *see Quaratino*, 71 F.3d at 64.  If the defendant comes forward

with a legitimate, non-discriminatory reason for the challenged

employment action, the presumption of discrimination is overcome, and

the defendant "will be entitled to summary judgment . . . unless the plaintiff

can point to evidence that reasonably supports a finding of prohibited

discrimination."  *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.

2000) (citations omitted); *see Legg v. Ulster Cty.*, 820 F.3d 67, 74 (2d Cir.

2016).

 Ultimately, once the burden shifts back to the plaintiff, she must

show, without the benefit of the presumption, that the employer's

determination was, in fact, the result of discrimination.  *See Holcomb v.

Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).  The plaintiff must

demonstrate "by a preponderance of the evidence that the legitimate

reasons offered by the defendant were not its true reasons, but were a

pretext for discrimination."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 253 (1981) (citation omitted); *see Kerzer v. Kingly Mfg.*, 156 F.3d

14

396, 401 (2d Cir. 1998).  As further explained by the Supreme Court, to
demonstrate pretext, a plaintiff must show "*both* that the [employer's
proffered] reason was false, *and* that discrimination was the real reason."
*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (citation omitted);
*see Quaratino*, 71 F.3d at 64*.*  However, conclusory allegations of
discrimination are insufficient to defeat a motion for summary judgment.
*See Holcomb*, 521 F.3d at 137; *Schwapp v. Town of Avon*, 118 F.3d 106,
110 (2d Cir. 1997).

Here, Larkin has arguably proffered sufficient evidence to establish a
*prima facie* pregnancy discrimination claim: (1) she was pregnant; (2) she
satisfactorily performed her duties as a phlebotomist; (3) she was
terminated; and (4) her position was filled by a non-pregnant employee.
(Dkt. No. 38, Attach. 1 at 3.)  Whether Larkin has submitted sufficient
evidence of a decisionmaker's knowledge of her pregnancy is a closer
question.  Assuming, without deciding, that Larkin has stated a *prima facie*
case, her Title VII pregnancy discrimination claim nonetheless fails
because she has failed to demonstrate that CVPH's legitimate,
non-discriminatory reason to terminate her was mere pretext for
discrimination.

15

CVPH contends that, because CVPH has articulated a legitimate, non-discriminatory reason for Larkin's termination—that it "honestly believed" that Larkin improperly accessed CVPH patients' confidential medical information in violation of its confidentiality policy—and because Larkin "has absolutely no evidence that this reason was pretextual, and that pregnancy animus and/or retaliation were the true reasons for her discharge," summary judgment is warranted.  (Dkt. No. 48, Attach. 11 at 14-17.)  Larkin argues that CVPH's reason was pretextual because CVPH "lied to the union and falsely represented" that Larkin had improperly accessed medical records; violated its own policies and procedures before terminating her; failed to properly investigate; "rush[ed] to judgment and terminate[d] her employment in minimal time"; and changed its story.  (Dkt. No. 38, Attach. 1 at 9-20.)  The court agrees with CVPH.

Here, CVPH has met its burden by putting forth evidence that Larkin was fired because a patient complained about a purported disclosure of her confidential information, and CVPH's ensuing investigation resulted in a finding, at the time, that Larkin had improperly accessed patients' records in violation of the hospital's confidentiality policy.  (Dkt. No. 48,

16

Attach. 11 at 13.)

None of Larkin's arguments or purported factual disputes regarding the circumstances surrounding her termination are sufficient for a rational jury to find that the legitimate, non-discriminatory reason for terminating Larkin was a pretext for discrimination.  Indeed, there is nothing in the record to suggest that CVPH's decision can be attributed to a discriminatory motive.

For instance, the record is devoid of any comments or actions whatsoever by anyone at CVPH indicating that they had a discriminatory animus against pregnant employees.  Nor is there evidence of discriminatory intent with respect to events surrounding the investigation and the ensuing termination decisionmaking process.  Rather, the investigation was based on a complaint from a patient who believed her information was wrongfully shared, (Def.'s SMF ¶ 51-52), and, at the time, the result of the investigation—a finding of a breach of patient confidentiality—was reported to Gosrich, (*id.* ¶ 69).  Gosrich testified that he was the one who made the decision to terminate Larkin; that her pregnancy did not come to his attention prior to making the decision to terminate her; and such decision was based on the belief that Larkin had

17

violated CVPH's confidentiality policy.  (Dkt. No. 38, Attach. 14 at 24, 91.)

And there is no evidence to suggest that those involved in Larkin's

termination did not honestly believe that she had committed a

confidentiality breach.  *See Shah v. Eclipsys Corp*., No. 08-CV-2528, 2010

WL 2710618 at *10 (E.D.N.Y. July 7, 2010) ("To be a valid legitimate,

nondiscriminatory reason for termination, an employer's belief need not be

correct, only honestly held." (citations omitted)); *Jeunes v. Potter*, No.

3:08-CV-1218, 2009 WL 2883060, at *9-10 (D. Conn. Sept. 3, 2009) ("In

determining whether a plaintiff has produced sufficient evidence of pretext,

the key question is not whether the stated basis for termination actually

occurred, but whether the defendant believed it to have occurred." (citation

omitted)); *Warren v. N. Shore Univ. Hosp*., No. CV-03-0019, 2006 WL

2844259, at *9 (E.D.N.Y. Sept. 29, 2006) ("An inaccurate, but honestly

held belief about an employee does not establish a claim of pretext."

(citation omitted)).  And, in any event, an employer may undertake an

adverse employment action "for a good reason, a bad reason, a reason

based on erroneous facts, or for no reason at all, as long as its action is

not for a discriminatory reason."  *DeLuca v. Allied Domecq Quick Service

Restaurants*, No. 03-CV-5142, 2006 WL 1662611 at *9 (E.D.N.Y. June 13,

18

2006) (citations omitted).

Even assuming that any person involved in the investigation or decision to terminate Larkin was aware of Larkin's pregnancy, there is no evidence that the investigation or conclusion was in any way altered by this knowledge.  *See Lambert*, 543 F. Supp. 2d at 280 ("[The decisionmakers'] decisions could only have been discriminatory to the extent that they relied on recommendations or assessments that were motivated by improper consideration of [plaintiff's] pregnancy.  This means that none of [the decisionmakers'] independent pre-termination actions or perceptions, however unfair or erroneous, can give rise to an inference that [they were] motivated by [plaintiff's] pregnancy.").  Indeed, it is undisputed that Gosrich relied on information from Thornton and Miller in making his termination decision, and that such decision was based only on the grounds of the FairWarning report and Church's complaint.  (Pl.'s SMF ¶¶ 60, 90, 99.)  Larkin's arguments to the contrary essentially boil down to a faulty syllogism: "something bad happened to her at work; she is in a protected class; therefore it must have happened because she is in that protected class."  *Nielsen v. Pioneer Bank*, No. 1:15-cv-623, 2018 WL 4689056, at *4 (N.D.N.Y. Sept. 28, 2018) (citation omitted); *see Lambert*,

19

543 F. Supp. 2d at 282 ("In sum, plaintiff's only evidence that [her supervisor's] stated reasons for recommending [her] termination . . . are pretext for unlawful pregnancy discrimination is the fact that plaintiff was pregnant and that she was treated unfairly.  This is plainly insufficient." (citations omitted)).

As to the investigation itself, Estes testified that this was a "standard" CVPH confidentiality investigation, and he did not recognize any inconsistencies between the investigation into Larkin's alleged breach as compared to the investigations of other employees of which he had previously been a part of.  (Dkt. No. 38, Attach. 17 at 39-40.)  In any event, "a faulty investigation is not in and of itself evidence of pretext." *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010) (citation omitted); *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." (citations omitted)).

20

In sum, although it was ultimately determined that Larkin did not, in fact, commit a breach of CVPH's confidentiality policy, there is no evidence in the record to permit a reasonable jury to find that CVPH intentionally discriminated against Larkin on the basis of her pregnancy. *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what *motivated* the employer." (internal quotation marks and citation omitted)); *Robinson v. Zurich N. Am. Ins. Co.*, 892 F. Supp. 2d 409, 430 (E.D.N.Y. 2012) ("The question in this Title VII case is not whether defendants' decision to terminate plaintiff was correct but whether it was discriminatory.  It is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." (citations omitted)).

Accordingly, CVPH is entitled to summary judgment as to Larkin's Title VII pregnancy discrimination claim, and the claim is dismissed.

## B.    Title VII and FMLA Retaliation

Both Title VII and FMLA retaliation claims are analyzed under the *McDonnell Douglas* burden shifting framework.  *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2015).  For the reasons explained above, even assuming Larkin has raised a *prima facie* claim for Title VII and FMLA retaliation, because CVPH had a non-retaliatory, non-pretextual reason for terminating Larkin, Larkin's claims fail.  Accordingly, CVPH is entitled to summary judgment as to Larkin's Title VII and FMLA retaliation claims, and the claims are dismissed.

## C.    FMLA Interference

Under 29 U.S.C. § 2615(a)(1), "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  "An employee may bring an interference claim against the employer when the employer in some manner impeded the employee's exercise of the rights afforded substantive protection under the FMLA."  *Bowman v. CSX Transp., Inc.*, 22 F. Supp. 3d 181, 188-89 (N.D.N.Y. 2014) (internal quotation marks, alterations, and citation omitted).  To state a *prima facie* interference claim pursuant to the FMLA, Larkin must allege: (1) she is an eligible employee;

22

(2) CVPH qualifies as an employer under the FMLA; (3) she was entitled to take leave under the FMLA; (4) she gave notice to CVPH of her intention to take leave; and (5) CVPH denied her benefits to which she was entitled under the FMLA. *See id.*

Assuming, without deciding, that Larkin has established a *prima facie* interference claim, for the reasons explained above, her claim fails. In order to prove an interference claim, a plaintiff must show that the defendant "considered [the plaintiff's] FMLA leave . . . a negative factor in its decision to terminate him." *Sista v. CDC Ixis N. Am.*, Inc., 445 F.3d 161, 176 (2d Cir. 2006) (citation omitted). "[I]t is well-settled that an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave." *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011) (citations omitted); *see Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005) ("As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420,

429 (S.D.N.Y. 2004) ("FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." (citation omitted)).

Here, Larkin cannot establish that she was discharged for requesting FMLA leave, or that it was a "negative factor" in CVPH's decision to terminate her.  *Sista*, 445 F.3d at 176.  Indeed, as discussed above, Larkin was terminated based on CVPH's belief that Larkin improperly accessed CVPH patients' confidential medical information in violation of its confidentiality policy, and there is no evidence from which a reasonable fact finder could conclude that her request for leave played any role in this employment decision.  Accordingly, CVPH is entitled to summary judgment as to Larkin's FMLA interference claim, and the claim is dismissed.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Larkin's motion for partial summary judgment (Dkt. No. 38) is **DENIED**; and it is further

**ORDERED** that Larkin's motion to remove restrictions (Dkt. No. 39) is **DENIED as moot**; and it is further

**ORDERED** that CVPH's cross-motion for summary judgment (Dkt. No. 48) is **GRANTED**; and it is further

**ORDERED** that Larkin's complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

December 2, 2020
Albany, New York

Gary L. Sharpe
U.S. District Judge

25